IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 12, 2014

## STATE OF TENNESSEE v. SHAWN CHRISTOPHER SALES

**Appeal from the Circuit Court for Rutherford County**
**No. F-67696A       David Bragg, Judge**

_____

**No. M2013-01510-CCA-R3-CD - Filed February 28, 2014**

_____

The Defendant, Shawn Christopher Sales, pled guilty to robbery, and the trial court sentenced him to 163 days in confinement followed by fifteen years to be served in Community Corrections. In March 2013, the Defendant's Community Corrections officer filed a second affidavit alleging the Defendant had violated his Community Corrections sentence, and, after a hearing, the trial court ordered the Defendant to serve the remainder of his sentence in confinement. On appeal, the Defendant contends the trial court erred when it revoked his Community Corrections sentence because the State presented insufficient evidence to support the revocation. After a thorough review of the record and applicable authorities, we conclude that the trial court did not err when it revoked the Defendant's Community Corrections sentence, and we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and JEFFREY S. BIVINS, JJ., joined.

Billie I. Zimmermann, Murfreesboro, Tennessee, for the appellant, Shawn Christopher Sales.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; and Nathan Nicholas, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Background**

1

This case arises out of the Defendant's plea of guilty to robbery. The trial court sentenced the Defendant, a Career Offender, to 163 days in confinement and the remainder of his fifteen year sentence on Community Corrections. The suspended sentence order listed the conditions of the Defendant's Community Corrections sentence, which included that he: have "[g]ood and lawful conduct and abide by all the rules of probation;" "[s]ubmit to random drug/alcohol screens and do not use or associate with anyone using illegal drugs;" "[n]ot to use or associate with anyone using alcohol;" "[p]ay the cost, fines and restitution as directed by the supervising agency;" have "[n]o association with convicted felons (except family);" and have "[n]o direct or indirect contact with the victim or the victim's family and stay away from all places frequented by them." The suspended sentence order also informed the Defendant that any violation of the rules of probation would result in the service of the entire sentence.

On January 30, 2013, a violation of probation order was filed. The order indicated that a warrant had been issued based upon the Defendant violating his probation. The order indicated that the Defendant agreed he had violated his probation, and the warrant was sustained. The Defendant was ordered to serve 115 days in confinement before reinstatement to the original term of Community Corrections. The conditions of the sentence remained the same, with the following additional condition being added or modified: "[n]ot to use/associate with anyone using alcohol *to excess.*" The Defendant agreed that any further violation of his probation would result in the service of his entire sentence, and he also agreed to waive application for a suspended sentence both now and in the future. After these agreements, the trial court dismissed the amended warrants.

On March 11, 2013, the Defendant's Community Corrections officer filed an affidavit alleging that the Defendant had violated his Community Corrections sentence. He swore:

Shawn Christopher Sales did not report to his Community Corrections case officer the week of 02/25/2013-03/01/2013. Mr. Sales was not home on 03/04/3013 [sic] at 8:45 am, during a random home visit at 705 A. East Castle Street . . . . The occupants of the residence stated that Shawn Sales does not live at that address. A female occupant of the residence stated that Shawn Sales is her cousin, but that he does not live there. On 03/04/2013, at 8:35 am, Mr. Sales told his Community Corrections case officer that he does live at 705 A East Castle Street . . . his correct address is unknown. Mr. Sales has not paid any of his court costs and fines. Mr. Sales has not paid any of his Community Corrections and Supervision fees. Mr. Sales has not provided a biological sample for the purpose of DNA, as required by TCA 40-35-321. Mr. Sales has not attended required MRT classes. Mr. Sales has done no community service work. On 03/08/2013, at 2:45pm, Mr. Sales was not at 705

A. East Castle Street . . . during a random home visit.  A female occupant of the residence stated, again, that Mr. Sales does not live at that address, and also stated that, in fact, [he] has never lived at that residence.

Based upon this affidavit, the trial court issued a  warrant for the Defendant's arrest. At a hearing, the parties presented the following evidence: Jeff Tenaglia, the Defendant's Community Corrections officer, testified that the Defendant was placed on Community Corrections after pleading guilty to robbery.  Officer Tenaglia testified that the Defendant first violated his sentence 151 days after being placed on Community Corrections.  After the Defendant violated his sentence, he was ordered to serve 115 days in confinement, after which he was returned to Community Corrections on January 30, 2013.  Forty-one days later, on March 12, 2013, the Defendant again violated his the conditions of his sentence.

Officer Tenaglia testified that, on the second occasion, the Defendant violated his sentence in numerous ways.  He failed to report on February 25, 2013, and he was not present during home visits on February 2, 2013, February 17, 2013, March 3, 2013, March 4, 2013, and March 8, 2013.  Officer Tenaglia testified that the Defendant reported on March 11, 2013, and the officer told him that he had been to the residence the Defendant listed as his home address and that the people there said the Defendant did not live there.  The Defendant told him that he did, in fact, live there.  Officer Tenaglia said he asked the Defendant to accompany him to the address, and the Defendant agreed.  When they arrived, they knocked on the door.  In the presence of the Defendant, Officer Tenaglia again asked the residents if the Defendant lived there, and they said "no."

The officer said the Defendant maintained that he lived there and that he had some possessions there.  Officer Tenaglia asked the residents if the Defendant had possessions there, and they said "no."  The residents said they were familiar with the Defendant and that he had "stayed" with them in the past at a different address but that he had never lived at this address. Further, the residents informed him that the Defendant did not have any possessions at that address.  Officer Tenaglia then left and spoke with the Defendant privately.  He told the Defendant that he knew the Defendant was not living at the residence, and the Defendant admitted he was homeless and living out of his vehicle.

Officer Tenaglia explained the importance of a physical address for an offender serving a Community Corrections sentence.  He said that the Community Corrections requirements require the offender to be at home unless they are at work or attending school. The Defendant had not asked for permission to leave his home.  Further, had he informed the officer of his situation, the officer would have referred him to a shelter, which would then become his physical address.

3

Officer Tenaglia noted the Defendant's additional violations, which included: not paying court costs and fines, not submitting to a DNA sample, not participating in public service, and not completing his required moral recognition therapy ("MRT") class.

During cross-examination, Officer Tenaglia testified that the Defendant had failed to report on one occasion. The officer said that the Defendant informed him that he would have to move from the 705 A address because he was not getting along with the people who lived there, saying that he was going to move in with his grandmother. Officer Tenaglia testified that his office would not take a DNA sample or allow an offender to take the MRT class until they paid the appropriate fees, which were $37.00 and $26.00, respectively. Officer Tenaglia testified that the first violation was based upon a failed drug screen, but the Defendant had since passed multiple drug screens.

The Defendant testified that he was twenty-four years old at the time of the hearing. He said that, while he was on probation, he had looked for employment but to no avail. The Defendant said that, when he was released in January, he was living at the 705 A address with Marcus Jefferson, whose girlfriend sometimes spent the night. The Defendant said that, shortly after moving in, Mr. Jefferson's landlord learned that the Defendant was a convicted felon. She said he was not allowed to live in the residence. The Defendant said that he left the 705 A address during the last week of February. He said that, in March on the Friday before he was supposed to report, he informed Officer Tengalia during a telephone conversation that he was going to have to move out of the 705 A address. He said he further told him that he was going to live with his grandmother at U-189 Imperial Gardens. The Defendant denied telling Officer Tenaglia that he was living out of his car. In fact, he said, he did not own a car.

The Defendant said he did not provide a DNA sample because he did not have the money to pay for the fee. The Defendant said that, if he were returned to Community Corrections, he had a place to live, a cell phone, and the knowledge of how to get a job. The Defendant said that he did not take the MRT class because he had a "charge partner" who was in the class, and he understood he could not take the twelve-week course at the same time as his "charge partner." He said that he had not started his community service because he "had heard" that he could go to the Dollar Store and purchase canned goods and that, for every can he purchased, he would earn one hour of community service. He explained that because he did not have any money he was unable to buy cans. He agreed he could have gone to a church to work toward his community service requirement.

During cross-examination, the Defendant said he had not begun his community service because he was "out looking for a job." He agreed that he had only had two or three job interviews. The Defendant agreed that he was on house arrest and was to call his

4

Community Corrections officer if he left the house. He also agreed that he was not living at the address he gave Officer Tenaglia when Community Corrections representatives came to that address looking for him on March 3, March 4, and March 8. The Defendant said he called Officer Tenaglia each time he left the residence. He said he was at a job interview during the home visit on February 2, and he did not recall where he was on February 17. He said that he was sure, however, he had asked permission to leave the residence.

Based upon this evidence, the trial court found:

> The Court finds based on the testimony, credibility of the witnesses as presented, that [the Defendant] has violated the terms of his Community Corrections sentence. Violation of house arrest, as well as a violation of having a place to stay. A violation of not getting his D.N.A. sample done or doing his M.R.T. class.

> [T]he questioning would raise an issue as to whether or not [the Defendant] had the financial ability to give the D.N.A. sample or . . . buy the book. And I guess it may be that [the Defendant] should not have been placed on Community Corrections initially if he would be unable to comply with those requirements of the program.

> However, he has been on the program and has earned some time while he has been there. The Court is aware and appreciative of the fact that [the Defendant] hasn't picked up any new charges, hasn't violated any drug screens during the time that he's been on this second bite at the apple. However, he has not complied with the terms of his Community Corrections order.

> And, so, the Court, based on that finding, orders that he serve his sentence as initially imposed.

The trial court revoked the Defendant's Community Corrections sentence and ordered the Defendant to serve his sentence in the Tennessee Department of Correction, with credit for time served and time under Community Corrections. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the trial court erred when it revoked his Community Corrections sentence because the State failed to show by a preponderance of the

5

evidence that the Defendant had violated the conditions of his supervision. The State responds that the trial court had substantial evidence to revoke his Community Corrections sentence.

Our review of a trial court's revocation of a Community Corrections sentence is similar to our review of a trial court's probation revocation. *State v. Harkins*, 811 S.W.2d 79, 83 (Tenn. 1991). A trial court may revoke probation upon its finding by a preponderance of the evidence that a violation of the conditions of probation has occurred. T.C.A. § 40-35-311(e) (2010). "In probation revocation hearings, the credibility of witnesses is to be determined by the trial judge." *State v. Mitchell*, 810 S.W.2d 733, 735 (Tenn. Crim. App. 1991). If a trial court revokes a defendant's probation, its options include ordering confinement, ordering the sentence into execution as originally entered, returning the defendant to probation on modified conditions as appropriate, or extending the defendant's period of probation by up to two years. T.C.A. § § 40-35-308(a), (c), -310 (2010); *see State v. Hunter*, 1 S.W.3d 643, 648 (Tenn. 1999).

The judgment of the trial court in a revocation proceeding will not be disturbed on appeal unless there has been an abuse of discretion. *See State v. Smith*, 909 S.W.2d 471, 473 (Tenn. Crim. App. 1995). In order for this court to find an abuse of discretion, "there must be no substantial evidence to support the conclusion of the trial court that a violation of the conditions of probation has occurred." *State v. Shaffer*, 45 S.W.3d 553, 554 (Tenn. 2001). After finding a violation, the trial court is vested with the statutory authority to "revoke the probation and suspension of sentence and cause the defendant to commence the execution of the judgment as originally entered . . . ." T.C.A. § 40-35-311(e)(1) (2010); *accord Hunter*, 1 S.W.3d at 646 (holding that the trial court retains the discretionary authority to order the defendant to serve his or her original sentence in confinement). Furthermore, when probation is revoked, the trial court may order "the original judgment so rendered to be in full force and effect from the date of the revocation of the suspension . . . ." T.C.A. § 40-35-310(a) (2010).

The evidence shows that the Defendant failed to report to his Community Corrections officer, failed to inform his officer that he was not living at the address he had previously provided, failed to complete any of his community service, failed to participate in his MRT class and failed to provide a DNA sample. Thus, the trial court did not abuse its discretion when it ordered the Defendant's Community Corrections sentence to be revoked. The Defendant is not entitled to relief on this issue.

### III. Conclusion

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE